## VON DAMM v. UNITED STATES.
### No. 4048.

Court of Customs and Patent Appeals.
May 29, 1937.

Barnes, Richardson & Colburn, of New York City (Albert Mac C. Barnes and J. Bradley Colburn, both of New York City, of counsel), for appellant.

Joseph R. Jackson, Asst. Atty. Gen. (Charles J. Miville, Sp. Atty., of New York City, of counsel), for United States.

Brooks & Brooks, of New York City (Ernest F. A. Place and Henry E. Otto, both of New York City, of counsel), amici curiæ.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

LENROOT, Associate Judge.

This is an appeal from a judgment of the United States Customs Court overruling a protest by appellant against the assessment of duty by the Collector of Customs at the Port of New York upon an importation of corn from Argentina.

The corn was assessed with duty at the rate of 25 cents per bushel of 56 pounds, under paragraph 724, Schedule 7, of the Tariff Act of 1930 (19 U.S.C.A. § 1001, Schedule 7, par. 724). Appellant claimed in his protest that the corn was dutiable at 12½ cents per bushel, or at 10 cents per bushel, " * * * under and by virtue of the provisions of existing treaties between the United States and the country of exportation, the Convention of Commercial Reciprocity of 1902 between Cuba and the United States [33 Stat. 2136], the Reciprocal Trade Agreement or Treaty of August 24, 1934 between Cuba and the United States [49 Stat. 3559], and section 350(a) of the Tariff Act of 1930 [as added by Reciprocal Tariff Act, June 12, 1934, § 1, 19 U.S.C.A. § 1351(a)]."

The case was submitted upon the following stipulated statement of facts: That the merchandise covered by the above protest consists of corn imported from Argentina; that said merchandise was assessed for duty under paragraph 724 of the Tariff Act of 1930 at the rate of 25 cents per bushel of 56 pounds.

Paragraph 724, Schedule 7, of the Tariff Act of 1930 (19 U.S.C.A. § 1001, Schedule 7, par. 724) reads as follows:

"Par. 724. Corn or maize, including cracked corn, 25 cents per bushel of fifty-six pounds; corn grits, meal, and flour, and similar products, 50 cents per one hundred pounds."

Articles II and VIII of the Treaty of Commercial Reciprocity between the United States and Cuba of December 11, 1902 (33 Stat. 2137, 2140), in so far as here pertinent, read as follows:

"Article II.

"During the term of this convention, all articles of merchandise not included in the foregoing Article I and being the product

of the soil or industry of the Republic of Cuba imported into the United States shall be admitted at a reduction of twenty percentum of the rates of duty thereon as provided by the Tariff Act of the United States approved July 24, 1897, or as may be provided by any tariff law of the United States subsequently enacted."

### "Article VIII.

"The rates of duty herein granted by the United States to the Republic of Cuba are and shall continue during the term of this convention preferential in respect to all like imports from other countries, and, in return for said preferential rates of duty granted to the Republic of Cuba by the United States, it is agreed that the concession herein granted on the part of the said Republic of Cuba to the products of the United States shall likewise be, and shall continue, during the term of this convention, preferential in respect to all like imports from other countries."

Section 316 of the Tariff Act of 1930 (19 U.S.C.A. § 1316) reads as follows:

"Sec. 316. *Cuban Reciprocity Treaty not affected.*

"Nothing in this Act [chapter] shall be construed to abrogate or in any manner impair or affect the provisions of the treaty of commercial reciprocity concluded between the United States and the Republic of Cuba on December 11, 1902, or the provisions of the Act of December 17, 1903, chapter 1 [sections 124 and 125 of this title]."

The Act of Congress approved June 12, 1934 (48 Stat. 943 [19 U.S.C.A. § 1351 et seq.]), entitled "An Act To amend the Tariff Act of 1930," hereinafter referred to as the "Reciprocal Tariff Act," reads, in so far as is here pertinent, as follows:

"Sec. 350. (a) For the purpose of expanding foreign markets for the products of the United States (as a means of assisting in the present emergency in restoring the American standard of living, in overcoming domestic unemployment and the present economic depression, in increasing the purchasing power of the American public, and in establishing and maintaining a better relationship among various branches of American agriculture, industry, mining, and commerce) by regulating the admission of foreign goods into the United States in accordance with the characteristics and needs of various branches of American production so that foreign markets will be made available to those branches of American production which require and are capable of developing such outlets by affording corresponding market opportunities for foreign products in the United States, the President, whenever he finds as a fact that any existing duties or other import restrictions of the United States or any foreign country are unduly burdening and restricting the foreign trade of the United States and that the purpose above declared will be promoted by the means hereinafter specified, is authorized from time to time—

"(1) To enter into foreign trade agreements with foreign governments or instrumentalities thereof; and

"(2) To proclaim such modifications of *existing duties* and other import restrictions, or such additional import restrictions, or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign trade agreements, as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder. No proclamation shall be made increasing or decreasing by more than 50 per centum any existing rate of duty or transferring any article between the dutiable and free lists. The proclaimed duties and other import restrictions shall apply to articles the growth, produce, or manufacture of all foreign countries, whether imported directly, or indirectly: Provided, That the President may suspend the application to articles the growth, produce, or manufacture of any country because of its discriminatory treatment of American commerce or because of other acts or policies which in his opinion tend to defeat the purposes set forth in this section; and the proclaimed duties and other import restrictions shall be in effect from and after such time as is specified in the proclamation. The President may at any time terminate any such proclamation in whole or in part. [Italics ours.]

"(b) Nothing in this section shall be construed to prevent the application, with respect to rates of duty established under this section pursuant to agreements with countries other than Cuba, of the provisions of the treaty of commercial reciprocity concluded between the United States and the Republic of Cuba on December 11, 1902, or to preclude giving effect to an exclusive

agreement with Cuba concluded under this section, modifying the existing preferential customs treatment of any article the growth, produce, or manufacture of Cuba: *Provided, That the duties payable* on such an article shall in no case be increased or decreased by more than 50 per centum of the duties now payable thereon." 19 U.S.C.A. § 1351 (a, b). (Italics ours.)

The Reciprocal Trade Agreement between the United States and Cuba of August 24, 1934 (49 Stat. 3559), hereinafter referred to as the "Cuban Agreement," in so far as is here pertinent, reads as follows:

"The President of the United States of America and the President of the Republic of Cuba, desirous of strengthening the traditional bonds of friendship and commerce between their respective countries by maintaining as the basis for their commercial relations the granting of reciprocal preferential treatment, *in continuation of the policy adopted in the Convention of Commercial Reciprocity of 1902 between the two countries,* and taking into consideration that changed conditions have rendered it necessary to modify the provisions of that Convention, have arrived at the following Agreement: [Italics ours.] * * * .

"Article III.

"Articles the growth, produce or manufacture of the Republic of Cuba, enumerated and described in Schedule II annexed hereto and made a part of this Agreement, shall, on their importation into the United States of America, be granted exclusive and preferential reductions in duties not less than the percentages specified respectively in Column 1 of the said Schedule, such percentages of reduction being applied to the lowest rates of duty, respectively, now or hereafter payable on like articles the growth, produce or manufacture of any other foreign country.

"No article the growth, produce or manufacture of the Republic of Cuba enumerated and described in Schedule II annexed hereto, with respect to which a rate of duty is specified in Column 2 of the said Schedule, shall in any case, except as provided in Article VIII or X, be subject to any customs duty in excess of the rate so specified.

"Every article the growth, produce or manufacture of the Republic of Cuba which is not provided for in Article I, and which is not enumerated and described in Schedule II annexed to this Agreement, shall, on importation into the United States of America, be granted an exclusive and preferential reduction in duty of not less than 20 per centum, such percentage of reduction being applied to the lowest rate of duty now or hereafter payable on the like article the growth, produce or manufacture of any other foreign country." 49 Stat. 3559, 3561.

Schedule II (49 Stat. 3636, 3642) therein referred to, in so far as pertinent to this case, is copied below:

"Schedule II.

| "Tariff Act of 1930 "Paragraph | Description of Articles | Column 1 Minimum preferential reduction to Cuba | Column 2 Maximum rates of duty. Specific rates in United States dollars |
|---|---|---|---|
| | "Note: The provisions of this Schedule shall be construed and given the same effect, and the application of collateral provisions of the tariff laws of the United States to the provisions of this Schedule shall be determined insofar as may be practicable, as if each provision of this Schedule appeared respectively in the paragraph of the Tariff Act of 1930 noted in the column at the left of the respective descriptions of articles. * * * | | |
| "724 | Corn or maize, * * *............... | 20 % | 0.10 per bushel of 56 pounds." |

In appellant's brief it is stated: "Neither the validity of section 350 of the Tariff Act of 1930 nor that of the Cuban Trade Agreement is here questioned. The issue is solely one of proper construction. Protest is levelled at the administrative act of the Collector of Customs at New York in assessing duty at 25¢ per bushel as being in contravention of the law when such law is properly construed and applied."

Appellant's contention upon the issue raised is stated in his brief as follows:

"1. That the 10¢ per bushel maximum duty on corn set forth in Column 2 of Schedule 2 of the Cuban Trade Agreement constitutes the duty granted to Cuba as a reciprocal concession under the general trade agreement powers of the President.

"2. That the minimum preferential of 20% set forth in Column 1 of Schedule 2 constitutes a guarantee of the maintenance of the exclusive preferential granted to Cuba in the Convention of Commercial Reciprocity of 1902.

"3. That except for the 20% exclusive preferential all the duty reduction on corn is automatically generalized to all other non-discriminating nations by operation of section 350(a) (2).

"4. That corn from Argentina should have been assessed for duty at 12½¢ per bushel under paragraph 724, Tariff Act of 1930, as amended by the proclaimed reciprocal trade agreement with Cuba of August 24, 1934."

It is the government's contention that the reduction resulting in the maximum rate of duty upon corn of 10 cents per bushel is exclusive and preferential to Cuba, and that the same was not automatically generalized, under any of the terms of the Reciprocal Tariff Act, to other nondiscriminating countries. It is conceded by the government that Argentina is a nondiscriminating country.

The Customs Court agreed with the contention of the government and overruled appellant's protest. Judgment was entered accordingly, and from such judgment appellant took this appeal.

Two questions are presented to us for determination, viz.:

1. Whether the Reciprocal Tariff Act, by its terms, authorizes the President to make an exclusive agreement with Cuba modifying the existing preferential customs treatment of any article the growth, produce, or manufacture of Cuba, by providing for a minimum preferential percentage reduction and establishing preferential maximum specific duties payable upon such articles. In other words, does the Reciprocal Tariff Act by its terms authorize the President to grant a preference to Cuba by fixing a maximum rate of 10 cents per bushel upon corn?

2. If it shall be held that the President was so authorized, should the Cuban agreement be construed as granting a preferential rate to Cuba of 10 cents per bushel upon corn, or should it be held that the rate of 10 cents per bushel should be generalized by mathematical computation to all nondiscriminating countries, including Argentina?

We will first consider the construction of section 350(b), (19 U.S.C.A. § 1351(b), supra. This section may be divided into three parts:

1. It is provided that, without any new exclusive agreement with Cuba, the 20 per centum reduction provided for in the Commercial Reciprocity Treaty with Cuba should be applicable "with respect to rates of duty established under this section pursuant to agreements with countries other than Cuba."

2. It is declared that the section should not "preclude giving effect to an exclusive agreement with Cuba concluded under this section, modifying the existing preferential customs treatment of any article the growth, produce, or manufacture of Cuba."

3. The proviso reads as follows:

"Provided, That the duties payable on such an article shall in no case be increased or decreased by more than 50 per centum of the duties now payable thereon."

It is clear that the first provision was intended to insure to Cuba the 20 per centum preferential reduction in duties proclaimed under reciprocal tariff agreements with countries other than Cuba, if no new exclusive agreement were made with Cuba under the Reciprocal Tariff Act.

It will be observed that this preferential treatment under the first provision is applicable only to reciprocal tariff agreements made with countries *other than* Cuba. If section 350(b), 19 U.S.C.A. § 1351(b), contained nothing more than this first provision, and a nonexclusive reciprocal tariff agreement were made with Cuba under section 350(a), 19 U.S.C.A. § 1351(a), as appellant insists was done in the case at bar

so far as the rate of 10 cents per bushel on corn is concerned, then Cuba would have had no preference at all, for such rate would have extended to all other nondiscriminating countries, and the first provision would, upon its face, have had no application because the agreement was not made with a country "other than Cuba." We are of the opinion that, in the absence of a new and exclusive agreement with Cuba, Congress intended that Cuba should continue to enjoy a 20 per centum reduction from the duties imposed by the Tariff Act of 1930, or provided for in any reciprocal tariff agreement made with countries other than Cuba, but that Congress did not intend that any reciprocal tariff agreement should be made with Cuba, the provisions of which should automatically extend to other nondiscriminating countries, although, of course, Cuba is in fact a foreign country and would come within the general language of section 350(a), except as otherwise provided in section 350(b).

We next come to the second provision of section 350(b), providing in effect that the President may conclude an *exclusive* agreement with Cuba "modifying the existing preferential customs treatment of any article the growth, produce, or manufacture of Cuba."

■ It is the contention of appellant that the power to modify existing preferential customs treatment is limited to a change in the rate of percentage preferential granted to Cuba under the Commercial Reciprocity Act, and that it does not authorize a preference by the fixing of specific rates lower than those granted to other countries. We see no sound basis for this contention.

Funk & Wagnalls Standard Dictionary defines "modify" as follows:

"1. To make somewhat different; change more or less in character, properties, form, or application; limit or restrict; vary; as, to *modify* the details of a plan; local causes *modify* climate; adverbs *modify* verbs. * * *"

We perceive no reason why the 20 per centum preferential to Cuba under the Commercial Reciprocity Treaty might not be modified by the granting to Cuba of a preferential specific rate of duty upon its products and by a change in the percentage preferential, the latter to be effective if the specific rate should cease to be preferential.

It is true, as pointed out by appellant's counsel, that a preferential specific rate might, through subsequent reciprocal tariff agreements with other countries, cease to be preferential to Cuba.

It is also contended that if section 350(b) does authorize preferential specific duties, the President could not thereafter enter into reciprocal tariff agreements with other countries lowering the general tariff rates, upon articles covered by specific rates in the agreement with Cuba, to a point equal to the specific rates provided for in the Cuban agreement, without violating said agreement as to preferential rates, either in whole or in part. This argument has no application here, for the reason that the existing Cuban agreement does protect Cuba in a contingency such as is above referred to by the fixing of a minimum percentage preferential rate; appellant concedes that this part of the agreement is entirely proper. In exercising the authority granted under section 350, the President, in making the reciprocal agreement with Cuba, has protected that country in preferential treatment, even though the specific preferential rates may cease to be preferential by reason of reciprocal tariff agreements with other countries. We think that Congress has employed language in section 350(b) sufficiently comprehensive to warrant this construction.

We next come to the proviso in section 350(b), reading as follows:

"Provided, That the duties payable on such an article shall in no case be increased or decreased by more than 50 per centum of the duties now payable thereon."

From a reading of section 350(a), it will be observed that reference is made to "existing rate of duty." We quote therefrom:

"No proclamation shall be made increasing or decreasing by more than 50 per centum any existing rate of duty."

The proviso in section 350(b) refers not to *existing rates of duty*, but states that *"duties payable"* shall in no case be increased or decreased by more than 50 per centum of the duties *"now payable* thereon." (Italics ours.) This seems clearly to contemplate that preferential treatment might be afforded to Cuba by means of specific duties, lower than the *duties payable* upon articles the growth, produce, or manufacture of Cuba, at the time the reciprocal agreement was entered into.

We have no doubt that, as thus analyzed, section 350(b) authorizes the President to enter into a reciprocal trade agreement with Cuba modifying the preference granted by the Commercial Reciprocity Treaty by according to Cuba changes in the 20 per centum preferential rate and by fixing preferential specific duties.

It follows from what we have said that said section 350 authorizes such a trade agreement with Cuba as is here involved.

█ The next question for consideration is whether the rate of 10 cents per bushel upon corn provided for in the Cuban agreement should be held to be a preferential rate of duty exclusive to Cuba.

It will be observed, first, that the preamble to said agreement, hereinbefore quoted, relates only to "reciprocal preferential treatment" and modification of the Commercial Reciprocity Treaty of 1902, the language being:

"The President of the United States of America and the President of the Republic of Cuba, desirous of strengthening the traditional bonds of friendship and commerce between their respective countries *by maintaining as the basis for their commercial relations the granting of reciprocal preferential treatment, in continuation of the policy adopted in the Convention of Commercial Reciprocity of 1902 between the two countries,* and taking into consideration that changed conditions *have rendered it necessary to modify the provisions of that Convention,* have arrived at the following Agreement."  (Italics ours.)  49 Stat. 3559.

Here there is no hint or intimation that any specific rates of duty fixed in the agreement should be other than preferential to Cuba and the United States.

We next come to article III of the Cuban agreement (49 Stat. 3561), hereinbefore quoted.  It recites that articles the growth, produce, or manufacture of Cuba enumerated in Schedule II (49 Stat. 3636), attached and made a part of the agreement, shall, on their importation into the United States, "be granted exclusive and preferential reductions in duties *not less* than the percentages specified respectively in Column 1 of the said Schedule." (Italics ours.)

Schedule II (49 Stat. 3636), attached to the agreement, has two columns, the first of which is headed "Minimum preferential reduction to Cuba," and the second of which is headed "Maximum rates of duty Specific rates in United States dollars." Column 1 gives the *minimum* preferential reduction on corn of 20 per centum, which is the fixed rate named in the Commercial Reciprocity Treaty, while column 2 states the *maximum* rate of duty upon corn as 10 cents per bushel (49 Stat. 3642).

It is too clear for argument that, when a preferential reduction of duty is provided for as a *minimum,* the parties to the agreement must have contemplated also a higher preferential rate, which, in our opinion, is exactly provided for in column 2.   With a basis of a general duty upon corn of 25 cents per bushel, the preferential percentage rate would be 20 per centum less, equal to 20 cents per bushel.  This was the *duty payable* under the Cuban Commercial Reciprocity Act.  Under the Reciprocal Tariff Act the President was authorized to reduce this preferential duty of 20 cents per bushel 50 per cent., or to 10 cents per bushel, which was done by the Cuban agreement, as evidenced by column 2 of Schedule II.  This being an exclusive agreement with Cuba, it was realized that reciprocal trade agreements with other countries might be made which, in some cases, might make the specific duties named in column 2 no longer preferential, in which case the percentage rate named in column 1 would become effective.  This is well illustrated by the duty upon rum fixed in the Cuban agreement at a maximum rate of $2.50 per gallon, and a minimum percentage preferential reduction to Cuba of 20 per centum (49 Stat. 3644).  After the Cuban agreement was made, a reciprocal trade agreement was made with Haiti fixing the tariff rate upon rum at $2.50 per gallon (49 Stat. 3737, 3752) ; this rate was 50 per centum less than the rate of $5 per gallon fixed by the Tariff Act of 1930.  The Haitian agreement was made under section 350(a), supra, and this rate was therefore automatically extended to all non-discriminating countries.  However, when this was done, the maximum rate of $2.50 per gallon in the Cuban agreement was no longer preferential, and therefore, to ascertain the duties payable on rum imported from Cuba, the product of that country; and preserve the preferential treatment to Cuba, the rate named in column 1 of Schedule II of the agreement would be resorted to; and Cuba is entitled to a rate of 20 per centum less than the duty fixed in the Haitian agreement.  However, when the Cuban agreement was made, the maximum rate

of $2.50 per gallon on rum was preferential to that country.

In the case of every article named in Schedule II of the Cuban agreement, the maximum rate named was less than the general tariff rates existing at that time, and remained preferential until some reciprocal trade agreement was made with some other country lowering the existing tariff rates to a point where the maximum rates named in the Cuban agreement would either cease to be preferential or be less preferential than the percentage rate of reduction provided for in the first column of Schedule II.

It seems to us that the Cuban agreement embodies a practicable plan for exclusive preferential duties on Cuban products, both by naming specific preferential duties and by preferential reduction percentages, and is clearly within the authority conferred upon the President by the Reciprocal Tariff Act.

Although not necessary to our decision herein, we think it proper to make one further observation. Appellant claims a rate of 12½ cents per bushel upon corn imported from Argentina. It is plain that he could not claim the rate proclaimed in the Cuban agreement of a maximum of 10 cents per bushel, for that would be in excess of the 50 per centum reduction of the general tariff rate applicable to corn imported from Argentina. It is also plain that the President has never proclaimed any rate of 12½ cents per bushel upon corn imported from any country.

Section 350(a), 19 U.S.C.A. § 1351(a), supra, provides that "The proclaimed duties * * * shall apply to articles the growth, produce, or manufacture of all foreign countries, whether imported directly, or indirectly."

Only by a mathematical calculation can the maximum rate of 10 cents per bushel on corn stated in the Cuban agreement be converted into a general tariff rate of 12½ cents per bushel. Upon this point we think it not inappropriate to quote from appellant's brief as follows:

"Under the general power as contained in Section 350 to negotiate trade agreements, the President is limited in his changes of the rates of duty to 50% of the 'existing rate of duty' on an article. It seems obvious to us that 'existing rate of duty' can mean only a rate of duty which is set forth in the general tariff published to and affecting all the world. A concession, or reduction, or discount from that general rate only ascertainable by a mathematical calculation and not anywhere published as a definite rate or figure cannot by any process of reasoning or stretching of the meaning of words be considered an 'existing rate of duty.' "

So here, we do not think that it could be held that the President has ever proclaimed a duty of 12½ cents per bushel upon corn, and for that reason, in addition to what we have hereinbefore said, appellant would not be entitled to the rate of 12½ cents per bushel claimed by him.

We have assumed that the Reciprocal Tariff Act is a valid enactment, and that it authorized the Cuban agreement here involved, as those issues have not been raised by the parties hereto.

For the reasons stated herein, the judgment of the United States Customs Court is affirmed.

Affirmed.