LOUIS WOLF & CO. v. UNITED STATES.

P. H. PETRY CO. et al. v. SAME.

DRAEGER SHIPPING CO. et al. v. SAME.
Customs Appeals Nos. 4222, 4223, 4232.

Court of Customs and Patent Appeals.
Dec. 4, 1939.

820

Allan R. Brown, of New York City, for appellants.

Webster J. Oliver, Asst. Atty. Gen. (Charles J. Miville, of New York City, of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

BLAND, Associate Judge.

In these three cases the First Division of the United States Customs Court overruled all the protests of the importers, and from its judgments in so doing appellants have appealed to this court. The three cases were briefed and argued together and require but one opinion for their decision.

In Customs Appeal No. 4222, the merchandise was imported from Japan; in Customs Appeal No. 4223 from Norway, and in Customs Appeal No. 4232 from Austria and Japan. The merchandise (a detailed description of which is not necessary) was entered in 1935 and 1936 and was, in all three cases, assessed with duty at the rates provided therefor in the Tariff Act of 1930, 19 U.S.C.A. § 1001 et seq.

The importers protested and claimed that their merchandise was entitled to a reduction in duty of 20 per centum from the rates provided in the Tariff Act of 1930, first, by reason of the "generalization clause" of section 350(a) of the Tariff Act of 1930, as amended by the Reciprocal Trade Agreements Act of June 12, 1934, 48 Stat. 943, 19 U.S.C.A. § 1351(a), and the provisions in the last paragraph of Article III of the trade agreement with Cuba of August 24, 1934, 49 Stat. 3559; and second, because of the most-favored-nation clauses contained in the respective treaties with Austria, Japan and Norway.

The pertinent parts of the Reciprocal Trade Agreements Act, supra, follow:

Sec. 350. "(a) * * · * the President * * * is authorized * * *

"(1) To enter into foreign trade agreements with foreign governments or instrumentalities thereof; and

"(2) To proclaim such modifications of existing duties * * * or such *continuance* * * * of existing customs or excise treatment of any article covered by foreign trade agreements, as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder. * * * The proclaimed duties and other import restrictions shall apply to articles the growth, produce, or manufacture of all foreign countries, whether imported directly, or indirectly: *Provided,* That the President may suspend the application to articles the growth, produce, or manufacture of any country because of its discriminatory treatment of American commerce or because of other acts or policies which in his opinion tend to defeat the purposes set forth in this section; and the proclaimed duties and other import restrictions shall be in effect from and after such time as is specified in the proclamation. The President may at any time terminate any such proclamation in whole or in part. [First italics ours.]

"(b) Nothing in this section shall be construed to prevent the application, with respect to rates of duty established under this section pursuant to agreements with countries other than Cuba, of the provisions of the treaty of commercial reciprocity concluded between the United States and the Republic of Cuba on December 11, 1902, *or to preclude giving effect to an exclusive agreement with Cuba concluded under this section, modifying the existing preferential customs treatment of any article the growth, produce, or manufacture of Cuba:* *Provided,* That the duties payable on such an article shall in no case be increased or decreased by more than 50 per centum of the duties now payable thereon. [Italics except *"Provided"* ours.]"

Articles I and III of the Cuban Trade Agreement of August 24, 1934, read as follows:

### "Article I

"During the term of this Agreement, all articles the growth, produce or manufacture of the United States of America which would have been admitted free of duty if imported into the Republic of Cuba on the day of signature of this Agreement, and all articles the growth, produce or manufacture of the Republic of Cuba which would have been admitted free of duty if imported into the United States of America on the day of signature of this Agreement, shall be so admitted by the respective country free of duty.
* * * * *

### "Article III

"Articles the growth, produce or manufacture of the Republic of Cuba enumerated and described in Schedule II annexed hereto and made a part of this Agreement, shall, on their importation into the United States of America, be. granted exclusive and preferential reductions in duties not less than the percentages specified respectively in Column 1 of the said Schedule, such percentages of reduction being applied to the lowest rates of duty, respectively, now or hereafter payable on like articles the growth, produce or manufacture of any other foreign country.

"No article the growth, produce or manufacture of the Republic of Cuba enumerated and described in Schedule II annexed hereto, with respect to which a rate of duty is specified in Column 2 of the said Schedule, shall in any case, except as provided in Article VIII or X, be subject to any customs duty in excess of the rate so specified.

"Every article the growth, produce or manufacture of the Republic of Cuba which is not provided for in Article I, and which is not enumerated and described in Schedule II annexed to this Agreement, shall, on importation into the United States of America, be granted an exclusive and preferential reduction in duty of not less than 20 per centum, such percentage of reduction being applied to the lowest rate of duty now or hereafter payable on the like article the growth, produce or manufacture of any other foreign country."

It is agreed by all parties that the merchandise involved herein is not covered by Article I of said trade agreement, which covers articles free of duty, nor by Schedule II thereof which is a compilation of various goods with specific reductions of rates of duty from the rates prevailing at the date of the signing of the agreement.

It will be noticed that subsection (b) of the Reciprocal Trade Agreements Act provides in effect that the generalization clause will not apply to an exclusive agreement with Cuba *"modifying* the existing preferential * * * treatment of any article

the growth, produce, or manufacture of Cuba." (Italics ours)

It is appellants' contention that this legislation authorized the President to make an agreement with Cuba which would be exclusive and preferential only in cases where there was a modification of the prevailing customs treatment which existed by virtue of the treaty of commercial reciprocity between the United States and Cuba of December 11, 1902, 33 Stat. 2136; that since the last paragraph of Article III of the 1934 agreement with Cuba (entered into under the authority of section 350(a) supra) in effect merely continued the then existing 20 per centum preferential in favor of Cuba, there had not been the required "modification" to avoid the application of the generalization clause and that, contrary to the authorization of the Reciprocal Trade Agreements Act the executive department has attempted to make an *exclusive* agreement which does *not* modify the old Cuban agreement of 1902; and that the generalization clause of the Reciprocal Trade Agreements Act therefore applies and permits other nations to have their goods imported at the 20 per centum reduction.

To state it in another way, appellants' contention on this point may be said to be that Congress, for the purpose of expanding the foreign trade of the United States, provided for the generalization of all duty concessions with three specific exceptions; first, as to countries which discriminate against our trade; second, as to the old Cuban reciprocity treaty of 1902 granting a 20 per centum preferential reduction as long as its provisions were in force; and third, as to any new agreement with Cuba which *modifies* the preferences granted by the old agreement with Cuba of 1902; that none of these exceptions apply and that, therefore, the generalization clause comes into operation.

Appellants further argue, in effect, that if the foregoing contentions be not acceded to, nevertheless their goods are entitled to the 20 per centum reduction by virtue of the commercial treaties with the three countries of exportation here involved—Japan, Norway and Austria; that the treaties with Norway and Austria are of the unconditional type and provide that any advantage extended by either of the parties thereto to any other country shall simultaneously and unconditionally be extended to the other party to the treaty; and that since by the Cuban Trade Agreement of 1934 a 20 per centum reduction was granted to Cuba, a like concession should be made as to merchandise coming from Austria and Norway. Article VII of the treaty with Austria of June 19, 1928, proclaimed May 28, 1931, 47 Stat. 1876, and Article VII of the treaty with Norway of June 5, 1928, proclaimed September 15, 1932, 47 Stat. 2135, are substantially the same. The importers quote the following from Article VII of the Austrian treaty:

"Article VII

\* \* \* \* \* \*

"Each of the High Contracting Parties binds itself unconditionally to impose no higher or other duties, or charges, and no conditions, prohibitions or restrictions, on the importation of any article, the growth, produce or manufacture of the territories of the other Party, from whatever place arriving, than are or shall be imposed on the importation of any like article, the growth, produce or manufacture of any other foreign country; nor shall any such duties, charges, conditions, prohibitions, or restrictions on importations be made effective retroactively.

\* \* \* \* \* \*

"Any advantage of whatsoever kind which either High Contracting Party may extend, by treaty, law, decree, regulation, practice or otherwise, to any article, the growth, produce or manufacture of any other foreign country *shall simultaneously and unconditionally,* without request and without compensation, be extended to the like article, the growth, produce or manufacture of the other High Contracting Party. [Italics ours.]"

The following is quoted by the importers from Article VII of the Norwegian treaty:

"The stipulations of this Article do not extend to the treatment which is accorded by the United States to the commerce of Cuba under the provisions of the Commercial Convention concluded by the United States and Cuba on December 11, 1902, *or any other commercial convention which hereafter may be concluded by the United States with Cuba.* Such stipulations, moreover, do not extend to the commerce of the United States with the Panama Canal Zone or with any of the dependencies of the United States or to the commerce of the dependencies of the United States with one another under existing or future laws. [Italics ours.]"

Appellants argue that the involved assessments of duty on the merchandise imported

from Norway and Austria were made not while the Cuban Trade Agreement of 1902 was in effect (Article XVI of the Cuban Trade Agreement of 1934 suspended the 1902 agreement), but under the 1934 agreement which, appellants contend, is not a commercial convention and therefore does not fall within the exception noted in said Article VII.

It is appellants' contention that merchandise coming from Japan should be entitled to the 20 per centum reduction by virtue of two treaties and a protocol—a treaty of commerce and navigation with Japan entered into on November 22, 1894, and proclaimed March 21, 1895, 29 Stat. 848; a treaty with Japan entered into on February 21, 1911, and proclaimed April 5, 1911, 37 Stat. 1504; and a protocol executed on the same day as the treaty of 1911, 37 Stat. 1510 —from which they quote as follows:

Treaty of 1894:

"Article IV

"No other or higher duties [or charges] shall be imposed on the importation into the territories of the United States of any article, the produce or manufacture of the territories of His Majesty the Emperor of Japan, from whatever place arriving; and no other or higher duties shall be imposed on the importation into the territories of His Majesty the Emperor of Japan of any article, the produce or manufacture of the territories of the United States, from whatever place arriving, than on the like article produced or manufactured in any other foreign country; * * *."

Treaty of 1911:

"Article V

"The import duties on articles, the produce or manufacture of the territories of one of the High Contracting Parties, upon importation into the territories of the other, shall henceforth be regulated either by treaty between the two countries or by the internal legislation of each."

Protocol of 1911:

"Pending the conclusion of a treaty relating to tariff, the provisions relating to tariff in the Treaty of the 22nd of November, 1894, shall be maintained."

These treaties are conditional in nature, but the appellants argue on this point as follows: "The decisions on conditional favored nation clauses are not at all in point here. There have been many decisions on reciprocal treaties, but in no case has there been a provision similar to that contained in section 350 extending to all nations the benefit of any concessions to a single nation. The principle of conditional treatment is exactly what has been overthrown by Congress in section 350 and the earlier decisions are not pertinent."

It is the position of the Government first, that the issues presented in this case have been decided adversely to the appellants by this court in F. H. Vonn Damm v. United States, 90 F.2d 263, 25 C.C.P.A., Customs, 97, T.D. 49094 and E. & J. Burke, Ltd. v. United States, 26 C.C.P.A., Customs, 374, C.A.D. 44; second, that the "Trade. Agreement Act must be read as a whole" and that the "entire scheme of the Cuban Commercial Convention of 1902 and the Cuban Trade Agreement of 1934 indicates that while Congress intended that tariff rates should be generalized" to all other countries, "Cuba was to receive exclusive preferential customs treatment"; that since section 350(a), supra, provides that the President is authorized not only to enter into foreign trade agreements but to proclaim such "modifications of existing duties * * * or such continuance * * * of existing customs or excise treatment of any article covered by foreign trade agreements, as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder" it would amount to an absurdity to assert that the President was authorized by Congress to increase the preferential, and at the same time was prohibited from continuing the same, and that the legislative history of said section 350 supports its views; third, that even if it be held that the Cuban agreement was not exclusive to Cuba but extended to all non-discriminatory countries, the appellants nevertheless would not be entitled to the 20 per centum reduction provided for in the last paragraph of Article III of the Cuban agreement for the reason that the reduction applied only to articles the growth, produce or manufacture of Cuba and there is no proof that the merchandise imported comes under that category; and fourth, that the appellants are not entitled to the reduction by reason of any of the provisions contained in the treaties with Norway and Austria because each of said treaties contains an express provision excepting from its operation any preferential treatment accorded to Cuban products; that the term "commercial convention" in said treaties is broad enough to cover the Cuban Trade Agreement of 1934 and is not

restricted to treaties approved by the Senate, as the appellants argue; that the treaties and protocol with Japan are conditional in nature and that under a line of well-known decisions Japan would not be entitled to the 20 per centum decrease unless she granted to the United States a corresponding· or equivalent concession which has not been done.

While the contentions presented by the appellants may involve many different arguments and considerations, we think appellants have presented but three questions which are necessary here for us to decide: First. Admitting, as appellants do, that it was the intention of the framers of the Cuban Trade Agreement of 1934 to extend the exclusive and preferential 20 per centum reduction to all articles covered by the last paragraph of Article III thereof, even though there was *no change or modification* of the particular rates which had previously existed, does the fact that they did not make such change or modification nullify their attempted preferential treatment extended to Cuba to said articles to the extent that the generalization clause in section 350(a) of said Reciprocal Trade Agreements Act shall have application?

Second. Are appellants' importations from Norway and Austria entitled to the 20 per centum reduction, extended to Cuba in said Article III of said trade agreement, by virtue of the existing unconditional treaties between the said exporting countries and the United States?

Third. Are appellants' importations from Japan entitled to the 20 per centum reduction granted to Cuba in said Article III by virtue of the above-referred-to treaties and protocol between the United States and Japan?

█ On the first question presented we are in disagreement with appellants' contentions. The Reciprocal Trade Agreements Act in terms authorizes agreements modifying existing duties and expressly authorizes a "continuance" of existing customs or excise treatment of any article covered by foreign trade agreements. We think it never was the intention of Congress to authorize anyone to make any customs agreement with Cuba which by reason of the generalization clause in said act would be extended to all other countries. In other words, a study of the history of preferential treatment in customs matters between the United States and Cuba during almost forty years last past makes impossible the conclusion that it was the intent of the Congress to authorize a departure from the well-settled and repeatedly reaffirmed policy of each country extending to the other exclusive preferential tariff treatment.

In this view we are confirmed not only by the language used in the Reciprocal Trade Agreements Act but by several other considerations, extrinsic in character. When the bill which later became the Reciprocal Trade Agreements Act was reported out of the Committee on Ways and Means of the House of Representatives, it contained,· in section 350(a), as an exception to the generalization clause, the following provision: "except that nothing in this section shall be construed to prevent the granting of exclusive preferential treatment to articles the growth, produce, or manufacture of the Republic of Cuba * * *"

In the report of the House committee is found the following statement: "Two exceptions are, however, made. The first permits the *continuance* of the preferential which has long been accorded by the United States to the Republic of Cuba. [Italics ours.]"

Thereafter, when the bill was being considered by the Senate, in a written statement filed with the Committee on Finance of the United States Senate by Assistant Secretary of State Sayre at a hearing held on April 27, 1934 ("Reciprocal Trade Agreements. Hearings before the Committee on Finance, United States Senate, 73rd Congress on H.R. 8687," page 101) it was pointed out in the following language that unless certain appropriate exceptions were made in the act the "preferential regime" between the United States and Cuba might be adversely affected:

"In the absence of an appropriate exception to this provision [the generalization clause] difficulty might arise in giving effect to the preferential regime between the United States and Cuba in the following circumstances:

\* \* \* \* \* \*

"(2) In the case of a new agreement with Cuba under the proposed legislation, whereby preferential rates of duty were established on importations from that country, it might be held that the provision whereby the proclaimed duties should apply to importations from all countries would require the extension of the

preferential rates on importations from Cuba to like importations from other countries. Under such a construction the duties on Cuban products would not be preferential duties and the agreement with Cuba would be violated."

It will be noticed that the above-quoted language in subsection (a) (2) of the House bill was taken out of that part of the bill and subsection (b), as it now appears in the act, was substituted in accordance with the suggestions made.

In view of the admission of appellants' counsel, it is unnecessary here to recite the preamble to the Cuban Trade Agreement of 1934 to which our attention has been called and the press release by the State Department to which the Government has referred, both of which indicate that it was clearly the intention of the framers of the trade agreement not to depart from the traditional exclusive preferential tariff treatment accorded to Cuba. (See George W. Cole & Co. et al. v. United States, 107 F.2d 815, 27 C.C. P.A., Customs, ——, decided concurrently herewith, where these matters are discussed). So, the real issue involved in determining the instant question is the interpretation to be given section 350 of the Reciprocal Trade Agreements Act, and we think that it in terms authorized a continuance of the exclusive and preferential treatment which the said Cuban Trade Agreement admittedly gives to the character of goods at bar when imported from Cuba. Indeed, it is difficult to see how the language could be given any other interpretation.

It would be absurd, it seems to us, to hold that Congress meant to require by section 350, particularly in view of the language used in subsection (a) (2) thereof, that if any new, exclusive and preferential agreement with Cuba was made it must modify or change the rates in the respect contended for by appellants. Surely, if it was found advisable in framing said agreement to continue the 20 per centum preferential status in articles not mentioned in Article I or Schedule II, it was not necessary in order to bring about the desirable purpose to make some kind of change or modification in the rates applicable to such goods. We think that *the trade agreement* under consideration did *modify* the customs treatment which Cuba was accorded by the convention of 1902. Many new rates were established and the mere fact that no new rate was established on the articles in controversy, to our minds is inconsequential.

In view, therefore, of the express provision in the latter part of Article III of the trade agreement granting exclusive and preferential rates of duty to Cuba on goods like those at bar, it seems beside the point to discuss whether or not the preferential provisions of the treaty of 1902 covering the goods in controversy have been repealed or suspended. We think it was the intention of the framers of the act and of the agreement under consideration to preserve and continue the exclusive preferential relationship which is here the subject of controversy, and that said act and agreement effectually carry out that intention.

Appellants have argued at some length to the effect that it was the intent of Congress, for the purposes stated in section 350(a) of the Reciprocal Trade Agreements Act, to require that if an agreement thereunder was thereafter entered into with Cuba or any other nation its provisions would instantly and unconditionally enure to the benefit of every nation in the world, with certain exceptions unimportant here, and that the so-called generalization clause was intended to and does bring about this result. It seems to us that every circumstance to which our attention has been called leads diametrically to the opposite conclusion when we have the tariff treatment with Cuba in mind.

The Government contends that the Vonn Damm case and the Burke case, supra, control the decision of this case under the doctrine of stare decisis. The following language is found in the Vonn Damm case [90 F.2d 268, 25 C.C.P.A., Customs, 97, T. D. 49094]: "* * * We are of the opinion that, in the absence of a new and exclusive agreement with Cuba, Congress intended that Cuba should continue to enjoy a 20 per centum reduction from the duties imposed by the Tariff Act of 1930, or provided for in any reciprocal tariff agreement made with countries other than Cuba, *but that Congress did not intend that any reciprocal tariff agreement should be made with Cuba, the provisions of which should automatically extend to other non-discriminating countries * * *.* [Italics supplied.]"

Importers' counsel has pointed out that that case involved as its main issue the preferential status of dutiable goods which

were enumerated in Schedule II of the Cuban Trade Agreement of 1934, and that the goods at bar, not being enumerated in Schedule II, but being dutiable goods relegated to the residuary clause in the last paragraph of Article III, the issue in that case was not the same as the issue at bar. The Burke case, supra, relied upon by the Government also had to do with goods enumerated in Schedule II and not with goods covered by the last paragraph of Article III, and this court in that case followed its holding in the Vonn Damm case, supra.

■ While the instant cases, as has been pointed out, involve a consideration which was not involved in the two last above-cited cases, the court, for reasons stated in the Vonn Damm case, there came to the conclusion that Congress, by the enactment of the Reciprocal Trade Agreements Act, never intended that the provisions of any agreement with Cuba entered into thereunder should be automatically extended to other nondiscriminating countries. Of course, if this was the Congressional intent, Congress never meant to authorize an extension of the provisions in the last paragraph of Article III to other countries, and the quoted language used in the Vonn Damm case has an apt bearing upon the issue at bar.

As to the second question relating to appellants' alleged rights by virtue of the treaties with Norway and Austria, the following provision of the treaty with Norway (a comparable provision being found in the Austrian treaty) must not be overlooked:

"Article VII

\* \* \* \* \* \*

"The stipulations of this Article do not extend to the treatment which is accorded by the United States to the commerce of Cuba under the provisions of the *Commercial Convention concluded by the United States and Cuba on December 11, 1902, or any other commercial convention which hereafter may be concluded by the United States with Cuba.* \* \* \* [Italics ours.]"

■ The framers of those treaties not only expressly agreed to respect the treaty of 1902 with Cuba but also any other "commercial convention" which thereafter might be concluded between the United States and Cuba. We think that by the use of the term "commercial convention" such a trade agreement as the Cuban Trade Agreement of 1934 was intended to be included, and it is our opinion that that agreement is a commercial convention although it was not ratified by the Senate. It is true that the treaties with Norway and Austria refer to the Cuban treaty of 1902 as a "Commercial Convention" and that it was ratified by the Senate. The treaty of 1902 refers to itself as a "convention." We think it well settled that the term "commercial convention" is broad enough not only to include commercial conventions which are ratified by the Senate when negotiated by the executive department of the Government, but that it also includes certain commercial agreements which may be authorized by Congress, if such conventions are within the powers so delegated.

On this phase of the case we think it proper to say that the President, pursuant to acts of Congress, frequently has entered into agreements with foreign states. For instance, he has concluded engagements concerning commerce and navigation, and in the form of reciprocal arrangements for the suspension of duties in return for equitable concessions. See Crandall, "Treaties [etc.]," 2nd edition, paragraph 62. See also Proclamation of President Theodore Roosevelt, December 5, 1907, announcing the conclusion of a commercial agreement with Great Britain under the tariff act of 1897, Malloy "Treaties, [etc.]," Vol. I, page 812.

■ The President is deemed to be the agent of the legislative department of the Government to ascertain and declare the event upon which its expressed will is to take effect.

In B. Altman & Co. v. United States, 224 U.S. 583, 601, 32 S.Ct. 593, 597, 56 L.Ed. 894, the following observations of Mr. Justice Day illustrate to some extent the difference between a treaty and an executive agreement: " \* \* \* While it may be true that this commercial agreement, made under authority of the tariff act of 1897, § 3, was not a treaty possessing the dignity of one requiring ratification by the Senate of the United States, it was an international compact, negotiated between the representatives of two sovereign nations, and made in the name and on behalf of the contracting countries, and dealing with important commercial relations between the two countries, and was proclaimed by the President. If not technically a treaty requiring ratification,

nevertheless it was a compact authorized by the Congress of the United States, negotiated and proclaimed under the authority of its President. We think such a compact is a treaty under the circuit court of appeals act, and, where its construction is directly involved, as it is here, there is a right of review by direct appeal to this court."

R.S. § 398, as amended by the act of June 12, 1934, 48 Stat. 943, 5 U.S.C.A. § 372, provides in part as follows: "For the purpose of making better postal arrangements with foreign countries * * * the Postmaster General, by and with the advice and consent of the President, may negotiate and conclude postal treaties or conventions * * *."

In United States v. Belmont, 301 U.S. 324, 330, 57 S.Ct. 758, 761, 81 L.Ed. 1134, where an agreement, not ratified by the Senate, made between the Soviet Government and the United States was involved, the Supreme Court of the United States used the following language: "A treaty signifies 'a compact made between two or more independent nations, with a view to the public welfare.' B. Altman & Co. v. United States, 224 U.S. 583, 600, 32 S.Ct. 593, 596, 56 L.Ed. 894. But an international compact, as this was, is not always a treaty which requires the participation of the Senate. There are many such compacts, of which a protocol, a modus vivendi, a postal convention, and agreements like that now under consideration are illustrations. See 5 Moore, Int. Law Digest, 210–221. The distinction was pointed out by this court in the Altman Case, supra, which arose under section 3 of the Tariff Act of 1897 (30 Stat. 151, 203), authorizing the President to conclude commercial agreements with foreign countries in certain specified matters. * * *"

From the above, and from many other authorities which might be cited, it may be seen that agreements entered into between the United States and foreign nations with respect to postal matters are referred to as conventions.

■ We think that an agreement such as the one at bar relating to customs duties which may be levied upon articles of commerce between the two countries (when the agreement is authorized by Congress, although not ratified by the Senate) may be properly styled a commercial convention. We therefore hold that appellants' contentions with reference to the effect of the treaties with Austria and Norway are without merit. See E. & J. Burke, Ltd. v. United States, 26 C.C.P.A., Customs, 374, 379, C.A.D. 44.

■ The agreements with Japan to which reference has been made are of the conditional variety. There is no provision in those treaties which imposes the obligation "unconditionally" to admit goods from Japan at the same rate of duty as that applied to goods from another country. Moreover, there is an express provision (Article XIV) in each of the treaties of 1894 and 1911, 29 Stat. 852 and 37 Stat. 1507, such as is found in practically all conditional treaties, to the effect that the party claiming the same tariff treatment as any other nation can have it gratuitously only if the concession in favor of the other nation has been gratuitous. In the instant case, the conventions giving Cuba preferential reductions in customs duty rates were not gratuitous but were granted upon certain concessions being made applicable to American goods imported into Cuba. There is no showing here that Japan has made any such concessions to the United States as has Cuba in the instant trade agreement. The effect of such treaties as those existing with Japan upon an issue such as is here presented is so well known as to require no extended discussion or citation of authority here.

See Bartram v. Robertson, 122 U.S. 116, 7 S.Ct. 1115, 30 L.Ed. 1118, and Whitney v. Robertson, 124 U.S. 190, 8 S.Ct. 456, 31 L.Ed. 386.

■ The appellants insist that when an agreement is entered into such as the Reciprocal Trade Agreement of 1934 with Cuba, the limitation placed upon a nation with whom we have a conditional treaty has been expressly removed by the generalization clause in the Reciprocal Trade Agreements Act. Our holding (made, we think, upon reason and good authority) that the generalization clause did not extend the 20 per centum preferential reduction given Cuba to any other nation, irrespective of treaties, whether conditional or unconditional, is a complete answer to this contention.

■ Moreover, on the first question here decided we have held in substance that the Reciprocal Trade Agreements Act and the agreement with Cuba entered into thereunder, were intended to and effectively did insure Cuba an exclusive preference in respect to merchandise embraced in said

Cuban agreement. It must necessarily follow, we think, that any treaty to the contrary, entered into prior to the effective date of the agreement, would be repealed or nullified. It is properly conceded by counsel for appellants that if there is any conflict between a treaty and a tariff act enacted subsequent to the effective date of the treaty the provisions of the tariff act must prevail. See Pigeon River Improvement, Slide & Boom Co. v. Charles W. Cox, Ltd., 291 U.S. 138, 160, 54 S.Ct. 361, 78 L.Ed. 695; and United States v. Domestic Fuel Corp. and Geo. E. Warren Corp., 71 F.2d 424, 21 C.C.P.A., Customs, 600, T.D. 47010.

Appellants contend, we think erroneously, that Article XIV in the conditional treaty with Japan does not relate to customs duties but "refers to the privileges, favors and immunities of citizens." Article XIV specifically recites "in all that concerns *commerce* and navigation, any privilege, favor or immunity [etc.]" (Italics ours.)

From all the foregoing it follows that the merchandise at bar imported from Austria, Norway and Japan was properly assessed with duty by the collector and that the trial court was without error in overruling the protests of appellants.

While in each case there were errors assigned relating to the denial by the trial court of an application for rehearing, the issue was not pressed in this court and requires no consideration here.

The judgments appealed from are affirmed.

Affirmed.