47 CCPA (Customs)

**STAR–KIST FOODS, INC., Appellant,**

v.

**UNITED STATES (Bruno Scheidt, Inc., Party in Interest), Appellee.**

**Customs Appeal No. 4988.**

United States Court of Customs
and Patent Appeals.
Dec. 15, 1959.

Lamb & Lerch, John G. Lerch, New York City (David A. Golden, New York City, of counsel), for appellant.

Shipley, Akerman & Pickett, Washington, D. C., Carl L. Shipley, Washington, D. C., amici curiæ.

George Cochran Doub, Asst. Atty. Gen., Richard E. FitzGibbon, Chief, Customs Section, Samuel D. Slade, Herman Marcuse, trial attorneys, Washington, D. C., of counsel (Geo. S. Leonard, trial attorney, Washington, D. C., of counsel), for the United States.

Before WORLEY, Chief Judge, and RICH, MARTIN and SMITH, Judges, and Judge WILLIAM H. KIRKPAT-RICK.*

MARTIN, Judge.

This appeal arose out of a protest filed by Star-Kist Foods, Inc., an American producer of canned tuna fish packed in oil and of tuna fish packed in distilled water (a "dietetic pack"). The protest was filed pursuant to section 516(b) of the Tariff Act of 1930, as amended, 19 U.S.C.A. § 1516(b), and attacked the assessment made by the Collector of Cus-

---

\* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Judge O'CONNELL, pursuant to provisions of Section 294(d), Title 28 United States Code.

toms, Port of New York, of an import of tuna fish packed in brine at 12½ per centum ad valorem. The Collector assessed the imported merchandise in accordance with paragraph 718(b) of the Tariff Act of 1930, 19 U.S.C.A. § 1001, par. 718(b), as modified by a trade agreement with Iceland, T.D. 50956.[1] Star-Kist asserted that the goods were dutiable at the rates imposed by Congress in paragraph 718(b).

Section 516(b) provides in pertinent part:

"*Classification.* The Secretary of the Treasury shall, upon written request by an American manufacturer, producer, or wholesaler, furnish the classification of and the rate of duty, if any, imposed upon, designated imported merchandise of a class or kind manufactured, produced, or sold at wholesale by him. If such manufacturer, producer, or wholesaler believes that the proper rate of duty is not being assessed, he may file a complaint with the Secretary of the Treasury setting forth a description of the merchandise, the classification, and the rate or rates of duty he believes proper, and the reasons for his belief."

Then follow the steps which the Secretary of the Treasury must take, and the action which the manufacturer, producer, or wholesaler may take if he disagrees with the Secretary's decision. Such permissive action includes the filing of a protest.

In a contest between the parties to the instant litigation, this court held, in a decision reported at 45 CCPA 16, C.A. D. 666, that Star-Kist Foods, Inc., was a manufacturer or producer of the same *class or kind* of merchandise as that imported within the meaning of section 516 (b) thereby reversing the decision of the Customs Court; Star-Kist was held to be entitled to maintain its protest, and the cause was remanded for action on the merits. It is from the judgment on remand that the instant appeal has arisen.

Appellant asserts two reasons for objecting to the Secretary's action refusing to disturb the collector's assessment of the imported tuna fish at the reduced duties under the trade agreement with Iceland. Each ground, it is asserted, requires a holding that the trade agreement, by virtue of which the duty on brine packed tuna fish was reduced from 25% to 12½% ad valorem, is null and void.

The first reason urged by appellant is that the Trade Agreements Act of 1934,[2] by authority of which the trade agree-

1. Paragraph 718(b) provides:
"Fish, prepared or preserved in any manner, when packed in air-tight containers weighing with their contents not more than fifteen pounds each (except fish packed in oil or in oil and other substances): * * * other fish, 25 per centum ad valorem."
The only change which T. D. 50956 has made, pertinent to this appeal, was the reduction of the dutiable rate to 12½ per centum ad valorem.

2. Section 350(a) of the Tariff Act of 1930 as amended by the Act of June 12, 1934 entitled "An Act To amend the Tariff Act of 1930," 48 Stat. 943, 19 U.S.C. 1351 (1940 ed.) as further amended by the Joint Resolution of June 7, 1943, 57 Stat. 125, 19 U.S.C.A. § 1351, and as it read at the time of the importation of the merchandise at bar, provided:

"(a) For the purpose of expanding foreign markets for the products of the United States (as a means of assisting in the present emergency of restoring the American standard of living, in overcoming domestic unemployment and the present economic depression, in increasing the purchasing power of the American public, and in establishing and maintaining a better relationship among various branches of American agriculture, industry, mining, and commerce) by regulating the admission of foreign goods into the United States in accordance with the characteristics and the needs of various branches of American production so that foreign markets will be made available to those branches of American production which require and are capable of developing such outlets by affording corresponding market opportunities for foreign products in the United States, the President, whenever he finds as a fact that any ex-

ment was negotiated, is null and void as being an unconstitutional delegation of legislative powers by the Congress to the President of the United States. Specifically, Star-Kist alleges that Congress has improperly attempted to delegate its legislative powers which are vested in it by the following Constitutional provisions:

Article I, Sec. 1:

"All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

Article I, Sec. 7:

"All bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills."

Article I, Sec. 8:

"The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States;

\* \* \* \* \* \*

"To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes; \* \* \*."

Second, appellant maintains that the trade agreement with Iceland, consummated under the provisions of the Trade Agreements Act of 1934, is a treaty and is therefore null and void because it was neither negotiated with the advice and consent of the Senate nor did two-thirds of the Senate concur in its execution as is required by Article II, Section 2, clause 2 of the Constitution, which reads as follows:

"He [the President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; \* \* \*."

Appellant maintains further that the proclamation of the President pronounced in connection with this trade agreement is also null and void.

We shall treat these questions in the order in which we have outlined the contentions of appellant.

At the outset of this discussion it is well to bear in mind that this court has no authority to chart a new course in jurisprudence in a field in which precedents have been established by the Supreme Court. It behooves us, therefore, to endeavor to propound the principles governing the issues presented here as

isting duties or other import restrictions of the United States or any foreign country are unduly burdening and restricting the foreign trade of the United States and that the purpose above declared will be promoted by the means hereinafter specified, is authorized from time to time—

"(1) To enter into foreign trade agreements with foreign governments or instrumentalities thereof; and

"(2) To proclaim such modifications of existing duties and other import restrictions, or such additional import restrictions, or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign trade agreements, as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder. No proclamation shall be made increasing or decreasing by more than 50 per centum any existing rate of duty or transferring any article between the dutiable and free lists. The proclaimed duties and other import restrictions shall apply to articles the growth, produce, or manufacture of all foreign countries, whether imported directly, or indirectly: *Provided*, That the President may suspend the application to articles the growth, produce, or manufacture of any country because of its discriminatory treatment of American commerce or because of other acts (including the operation of international cartels) or policies which in his opinion tend to defeat the purposes set forth in this section; and the proclaimed duties and other import restrictions shall be in effect from and after such time as is specified in the proclamation. The President may at any time terminate any such proclamation in whole or in part."

deduced from the pronouncements of that Court.

The first case coming to our attention which we consider pertinent is The Aurora v. United States, 7 Cranch 382, 3 L.Ed. 378. That was an appeal from the District Court of Orleans, condemning the cargo of the brig Aurora imported from Great Britain in violation of the non-intercourse act of March 1, 1809. Among other questions, the case involved the right of Congress to enact legislation which predicated the revival of an expired law upon a proclamation by the President attesting to the happening of certain events. It was argued that this procedure amounted to an unconstitutional delegation of legislative powers. In upholding the act, the Supreme Court said:

> " * * * we can see no sufficient reason, why the legislature should not exercise its discretion in reviving the act of March 1st, 1809, either expressly or conditionally, as their judgment should direct. The 19th section of that act, declaring that it should continue in force to a certain time, and no longer, could not restrict their power of extending its operation, without limitation upon the occurrence of any subsequent combination of events."

Another decision of the Supreme Court significantly relevant to the case at bar is Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294. That suit was brought by importers to obtain a refund of duty claimed to have been illegally exacted upon imported merchandise under the Tariff Act of 1890, 26 Stat. 567. The importers protested against the assessment alleging, inter alia, section 3 of that act to be an unconstitutional delegation of legislative and treaty-making powers. It provided, "That with a view to secure reciprocal trade with countries producing the following articles * * * whenever, and so often as the President shall be satisfied that the Government of any country producing * * * such articles, imposes duties or other exactions upon the agricultural or other products of the United States, which in view of the free introduction of * * * [such articles] into the United States he may deem to be reciprocally unequal and unreasonable, he shall have the power and it shall be his duty to suspend, by proclamation to that effect, the provisions of this act relating to the free introduction of * * * [such articles] for such time as he shall deem just, and in such case and during such suspension duties shall be levied, collected, and paid upon * * * [such articles]." There followed a list of the duties to be paid on those specific commodities. After reviewing many acts, the first being passed during the Washington administration, which delegated to the President power to lay embargoes and other restrictions on imports and exports whenever he felt that foreign countries were discriminating against the United States in matters of trade or for various other reasons, the Court stated:

> "It would seem to be unnecessary to make further reference to acts of Congress to show that the authority conferred upon the president by the third section of the act of October 1, 1890, is not an entirely new feature in the legislation of congress, but has the sanction of many precedents in legislation. While some of these precedents are stronger than others, in their application to the case before us, they all show that, in the judgment of the legislative branch of the government, it is often desirable, if not essential, for the protection of the interests of our people, against the unfriendly or discriminating regulations established by foreign governments, in the interests of their people, *to invest the president with large discretion in matters arising out of the execution of statutes relating to trade and commerce with other nations.* If the decision in the case of The Brig Aurora had never been rendered, the practical construction of the constitution, as given by so many acts of

congress, and embracing almost the entire period of our national existence, should not be overruled, unless upon a conviction that such legislation was clearly incompatible with the supreme law of the land. [Italics ours.]

\*   \*   \*   \*   \*   \*

"That Congress cannot delegate legislative power to the president is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the constitution. The act of October 1, 1890, in the particular under consideration, is not inconsistent with that principle. It does not, in any real sense, invest the president with the power of legislation. For the purpose of securing reciprocal trade with countries producing and exporting sugar, molasses, coffee, tea, and hides, congress itself determined that the provisions of the act of October 1, 1890, permitting the free introduction of such articles, should be suspended as to any country producing and exporting them that imposed exactions and duties on the agricultural and other products of the United States, which the president deemed, that is, which he found to be, reciprocally unequal and unreasonable. Congress itself prescribed, in advance, the duties to be levied, collected and paid, on sugar, molasses, coffee, tea, or hides, produced by or exported from such designated country, while the suspension lasted. \*   \*   \*

" 'The true distinction', as Judge Ranney speaking for the supreme court of Ohio has well said, 'is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made.' Cincinnati, Wilmington, etc., Railroad Co. v. Commissioners of Clinton County, 1 Ohio St. 77, 88." Id., 143 U.S. 690–694, 12 S.Ct. 504.

In 1927 the Supreme Court again had an opportunity to further pursue this subject in J. W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624. There appellant imported barium dioxide which was assessed at six cents per pound, two cents per pound more than was provided for by the Tariff Act of 1922. The increase was levied pursuant to a proclamation of the President issued by virtue of section 315 of the Tariff Act of 1922, 42 Stat. 941.

Section 315(a) provided in part:

"That in order to regulate the foreign commerce of the United States and to put into force and effect the policy of the Congress by this Act intended, whenever the President, upon investigation of the differences in costs of production of articles wholly or in part the growth or product of the United States and of like or similar articles wholly or in part the growth or product of competing foreign countries, shall find it thereby shown that the duties fixed in this Act do not equalize the said differences in costs of production in the United States, and the principal competing country he shall, by such investigation, ascertain said differences and determine and proclaim the changes in classifications or increases or decreases in any rate of duty provided in this Act shown by said ascertained differences in such costs of production necessary to equalize the same. \*   \*   \* such increased or decreased duties shall be levied, collected, and paid on such articles when imported from any foreign country into the United States \*   \*   \* *Provided,* that the total increase or decrease of such rates of duty shall not exceed 50 per centum of the rates specified in Title I of this Act \*   \*   \*.

"(c) That in ascertaining the differences in costs of production,

\* \* \* the President, in so far as he finds it practicable, shall take into consideration (1) differences in conditions in production, including wages, costs of material, and other items in costs of production of such or similar articles in the United States and in the competing foreign countries; (2) the differences in the wholesale selling prices of domestic and foreign articles in the principal markets of the United States; (3) Advantages granted to a foreign producer by a foreign government, \* \* \*; and (4) any other advantages or disadvantages in competition."

The act further provided that the United States Tariff Commission should assist the President in ascertaining the differences by undertaking investigations, and that no proclamation should be issued until the investigations had been completed. In addition, the President was given the power to terminate or modify the proclaimed rates of duty if the reasons for making the changes ceased to exist. The act expressly prohibited transferring articles between the dutiable list and the free list, changing the form of duty, and exceeding any maximum ad valorem rate of duty provided in any paragraph of Title I of the act.

The Customs Court sustained the rate of duty as increased by the proclamation of the President. The Court of Customs Appeals affirmed that judgment, and the Supreme Court, in upholding the judgment, went on to say:

"The field of Congress involves all and many varieties of legislative action, and Congress has found it frequently necessary to use officers of the executive branch, within defined limits, to secure the exact effect intended by its acts of legislation, by vesting discretion in such officers to make public regulations interpreting a statute and directing the details of its execution, even to the extent of providing for penalizing a breach of such regulations. Unit-

ed States v. Grimaud, 220 U.S. 506, 518, 31 S.Ct. 480, 55 L.Ed. 563; Union Bridge Co. v. United States, 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523; Buttfield v. Stranahan, 192 U.S. 470, 24 S.Ct. 349, 48 L.Ed. 525; In re Kollock, 165 U.S. 526, 17 S.Ct. 444, 41 L.Ed. 813; Oceanic Steam Navigation Co. v. Stranahan, 214 U.S. 320, 29 S.Ct. 671, 53 L.Ed. 1013.

"Congress may feel itself unable conveniently to determine exactly when its exercise of the legislative power should become effective, because dependent on future conditions, and it may leave the determination of such time to the decision of an executive, or, as often happens in matters of state legislation, it may be left to a popular vote of the residents of a district to be effected by the legislation. \* \* \* If Congress shall lay down by legislative act *an intelligible principle* to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power. *If it is thought wise to vary the customs duties according to changing conditions of production at home and abroad, it may authorize the Chief Executive to carry out this purpose,* with the advisory assistance of a Tariff Commission appointed under Congressional authority. *This conclusion is amply sustained by a case in which there was no advisory commission furnished the president*—a case to which this Court gave the fullest consideration nearly 40 years ago." [Italics added.] Id., 276 U.S. at pages 406–410, 48 S.Ct. at page 351.

Another important phase in the development of the principles in this field of law is the recognition by the Supreme Court of the flexibility allowable to the President when the legislation affects his conduct of foreign affairs. That principle was recognized by the Court in United States v. Curtiss-Wright Ex-

port Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255, wherein there was considered a joint resolution of Congress, 48 Stat. 811, giving the President power to prohibit the sale of arms to certain South American countries if he found that such prohibition would contribute to re-establishment of peace between the countries. The prohibition was to be invoked by the issuance of a proclamation by the President; violation was made punishable as a crime. The resolution was attacked as an unconstitutional delegation of legislative power, and in discussing that allegation, the Supreme Court said:

"Practically every volume of the United States Statutes contains one or more acts or joint resolutions of Congress authorizing action by the President in respect of subjects affecting foreign relations, *which either leave the exercise of the power to his unrestricted judgment, or provide a standard far more general than that which has always been considered requisite with regard to domestic affairs.*

\*　\*　\*　\*　\*　\*

"We had occasion to review these embargo and kindred acts in connection with an exhaustive discussion of the general subject of delegation of legislative power in a recent case, Panama Refining Co. v. Ryan, 293 U.S. 388, 421–422, 55 S.Ct. 241, 249, 79 L.Ed. 446, and, in justifying such acts, pointed out that they confided to the President 'an authority which was cognate to the conduct by him of the foreign relations of the government.'

"The result of holding that the joint resolution here under attack is void and unenforceable as constituting an unlawful delegation of legislative power would be to stamp this multitude of comparable acts

and resolutions as likewise invalid. And while this court may not, and should not, hesitate to declare acts of Congress, however many times repeated, to be unconstitutional if beyond all rational doubt it finds them to be so, an impressive array of legislation such as we have just set forth, enacted by nearly every Congress from the beginning of our national existence to the present day, must be given unusual weight in the process of reaching a correct determination of the problem. A legislative practice such as we have here, evidenced not by only occasional instances, but marked by the movement of a steady stream for a century and a half of time, goes a long way in the direction of proving the presence of unassailable ground for the constitutionality of the practice, to be found in the origin and history of the power involved, or in its nature, or in both combined.[3]" [Italics added.] Id., 299 U.S. at pages 324, 327–328, 57 S.Ct. at page 223.

Now we must endeavor to determine what principles of law can be adduced from the cases just reviewed. It is apparent that the development of the concepts of law in this field has been accomplished by a process of evolution.

■ First, the delegation of authority to the President to proclaim the happening of an event as a condition precedent to the invocation of an embargo on imports was sanctioned. The Aurora v. United States, supra. Next, legislation was upheld wherein Congress pronounced a policy, but the President, in order to act, was required to make a finding by proclamation, in which event certain imported articles would be suspended from the free list and specified duties would be imposed thereon. The President was

---

3. Footnote ours. "Congress may of course delegate very large grants of its power over foreign commerce to the President." Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 109, 68 S.Ct. 431, 435, 92 L. Ed. 568. See also Field v. Clark, supra, 143 U.S. at page 691, 12 S.Ct. at page 504, 36 L.Ed. 294.

480

given discretion, not only with reference to the finding, but also as to the duration of the suspension. Field v. Clark, supra. Later, legislation was approved which established a policy and which empowered the President, after a required investigation by the Tariff Commission and findings by him, to proclaim increases or decreases in the duties on all imported articles within 50 percent of the established rates. The President was further authorized to modify and change the proclaimed rates of duty so long as he followed the same procedure. He was prohibited from transferring articles to and from the free list and from exceeding any maximum ad valorem rate of duty specified in Title I of the Tariff Act of 1922. J. W. Hampton, Jr., & Co. v. United States, supra. Again it should be noted that Congress can give the President much broader discretionary powers in legislation inherently bearing upon his conduct of foreign affairs, such as that here under consideration, than when purely domestic matters are involved. United States v. Curtiss-Wright Export Corp., supra.

The Court's decisions in those cases have followed a discernible pattern and have set out certain principles which are the guideposts of Congress in enacting legislation which enlists the assistance of the President, and which are the fundamental guides in ascertaining whether Congress has adhered to the constitutional limitations.

■ A constitutional delegation of powers requires that Congress enunciate a policy or objective or give reasons for seeking the aid of the President. In addition the act must specify when the powers conferred may be utilized by establishing a standard or "intelligible principle" which is sufficient to make it clear when action is proper. And because Congress cannot abdicate its legislative fuction and confer carte blanche authority on the President, it must circumscribe that power in some manner. This means that Congress must tell the President what he can do by prescribing a standard which confines his discretion and which will guarantee that any authorized action he takes will tend to promote rather than flout the legislative purpose. It is not necessary that the guides be precise or mathematical formulae to be satisfactory in a constitutional sense.

In the act before us the Congressional policy is pronounced very clearly. The stated objectives are to expand foreign markets for the products of the United States "by regulating the admission of foreign goods into the United States in accordance with the characteristics and needs of various branches of American production so that foreign markets will be made available to those branches of American production which require and are capable of developing such outlets by affording corresponding market opportunities for foreign products in the United States * * *." These objectives are in their nature no different than those of the Tariff Act of 1890 wherein the stated policy was to secure reciprocally equal trade with countries producing certain enumerated articles, and the Tariff Act of 1922 which was designed to enable domestic producers to compete on an equal basis with foreign producers in the marketplaces of the United States.

Pursuant to the 1934 act the presidential power can be invoked "whenever he [the President] finds as a fact that any existing duties or other import restrictions of the United States or any foreign country are *unduly burdening or restricting the foreign trade of the United States* and that the [purposes of the act] will be promoted * * *." (Italics ours.) Under the 1890 act the President could invoke the statute when he was satisfied "that the Government of any country * * * imposes duties or other exactions upon * * * products of the United States * * * [which] he *may deem to be reciprocally unequal and unreasonable * * *.*" (Italics ours.) In this regard the 1922 act allowed the President to act if he found *"the duties prescribed in this Act do not equalize * * * differences in costs of production in the United States and the prin-*

*cipal competing country * * *.*" (Italics ours.)

Now what could the President do under the several acts?

After making the requisite findings under the act of 1890, the President could suspend the free introduction of the articles specified for such time as he deemd "*just*," and pursuant to the act of 1922, he could increase or decrease rates up to 50 per centum of those specified, but could not exceed any maximum stipulated in the act nor transfer any article between the dutiable and free lists.

Under the provisions of the 1934 act the President by proclamation can modify existing duties and other import restrictions but not by more than 50 percent of the specified duties nor can he place articles upon or take them off the free list. Furthermore, he must accomplish the purposes of the act through the medium of foreign trade agreements with other countries. However, he can suspend the operation of such agreements if he discovers discriminatory treatment of American commerce, and he can terminate, in whole or in part, any proclamation at any time.

Of course the acts of 1890, 1922, and 1934 are different, but we comprehend only a difference in degree. In each one Congress has allowed the President broad discretion, not only with respect to when he can act, but also in the exercise of the conferred powers. Under the act of 1890, he could suspend articles from the free list "for such time as he shall deem just." And under the Flexible Tariff Act of 1922, the President was authorized to modify duties to equalize the competitive opportunities of American and foreign producers in the markets of the United States. Although he was to be assisted by the Tariff Commission, and was to consider as far as

was "*practicable*" certain enumerated factors, as well as any other factors he himself deemed to be relevant, the final decision as respected equalization was his and *his alone*. While it is true that under that act the President was required to seek the advice of the Tariff Commission before he could act, the Court in the Hampton case recognized that an advisory commission is not necessary.[4] Consequently, the absence of such a provision in the Trade Agreements Act is inconsequential. Neither is the absence in the act of 1934 of a suggested list of factors to consider in applying the standard determinative of any of the issues.[5] Under both the 1922 and the 1934 acts, the President was given the power to increase or decrease duties up to 50 per centum of the specified rates. The difference lies only in the procedure set out in the 1922 act to *assist* the Chief Executive in making *his* decision.

■ As has been earlier pointed out, appellant maintains that there is no limitation on the adjustment in duties which the Chief Executive is authorized to make. The argument leads to the conclusion, for example, that even if the President finds that duties should be increased 50 per centum to comply with the policy declaration of the act, he may arbitrarily decrease them 50 per centum instead. We do not so read the language which Congress has provided in the section we are considering.

After making the enabling finding, the President is authorized to act in a manner such "that the purpose above declared will be promoted by the means hereinafter specified." Those means are to enter into foreign trade agreements and to proclaim certain modifications in various import restrictions. It becomes immediately apparent, therefore, that the President is limited to action which will

---

4. J. W. Hampton, Jr., & Co. v. United States, supra, 276 U.S. at pages 409–410, 48 S.Ct. at page 352.

5. In Field v. Clark, supra, there were no enumerated factors for consideration in applying the standard, and in J. W. Hampton, Jr., & Co. v. United States, supra, the fact that there was a suggested list of items to consider was not held to be a controlling feature of the case.

advance the policies of the act, and which will tend to secure the benefits considered desirable by the Congress. Not only must they advance the Congressional policy, but with respect to rate modifications, the problem with which appellant is most concerned, they must be "required or appropriate" to carrying out the trade-agreement as well. This additional language doubly emphasizes the fact that Congress limited the Presidential authority to modify duties strictly in accordance with the purposes for which the act was promulgated.

■ In view of the Supreme Court's recognition of the necessity of flexibility in the laws affecting foreign relations, and the many significant and limiting

similarities between the 1934 act on the one hand, and the 1890 and 1922 acts on the other, which latter acts the Supreme Court has approved, we are of the opinion that the 1934 act does not grant an unconstitutional delegation of authority to the President.

Appellant has relied greatly upon Panama Refining Co. v. Ryan,[6] 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446, and A. L. A. Schechter Poultry Corp. v. United States,[7] 295 U.S. 495, 55 S.Ct. 839, 840, 79 L.Ed. 1570, to support its contention that the Trade Agreements Act of 1934 is unconstitutional in that it confers an "unfettered discretion" upon the President. We have considered those cases, but since we find that the Supreme Court

6. By Section 9 of the National Industrial Recovery Act of June 16, 1933, 48 Stat. 195, 200, the President was empowered to prohibit the transportation in interstate and foreign commerce of petroleum and petroleum products produced or withdrawn from storage in excess of that permitted by state authority. He was further permitted by Section 10(a) to prescribe such rules and regulations as were necessary to carry out the purposes of the act, and violation of any such rule or regulation was made a misdemeanor. Appellants in the Panama case sought to enjoin enforcement of several of the regulations promulgated pursuant to the delegated powers, inter alia, challenging the constitutionality of Section 9(c).

With reference to Section 9(c), the Court said: " * * * it gives to the President an unlimited authority to determine the policy and to lay down the prohibition, or not to lay it down, as he may see fit." Id. 293 U.S. at page 415, 55 S.Ct. at page 246. The general policy declaration of Section 1, Title I, contained nothing circumscribing the powers conferred under Section 9(c). Id., 293 U.S. at pages 417–419, 55 S.Ct. at page 247. The Court concluded that "[a]s to the transportation of oil production in excess of state permission, the Congress has declared no policy, has established no standard, has laid down no rule. There is no requirement, no definition of circumstances and conditions in which the transportation is to be allowed or prohibited." Id., 293 U.S. at page 430, 55 S.Ct. at page 252.

7. Again under the National Industrial Recovery Act, Section 3, Title I, Congress

authorized the President to approve or prescribe "codes of fair competition" for any trade or industry, and made violation of any such code "in any transaction in or affecting interstate or foreign commerce" a misdemeanor. Pursuant to the act, the President approved a code of fair competition for the live poultry industry of the New York Metropolitan area. Defendants, having violated several provisions of the "Live Poultry Code," attacked the act as being an unconstitutional delegation of legislative powers. The Court in the Schechter case in holding Section 3 invalid, found that "fair competition" was a phrase of extremely broad scope and indefinite meaning. While the President was limited to promulgating codes which would tend to effectuate the policies of the act, there was no limitation upon what could be introduced into a code. The Court said:

"It [Section 3] supplies no standards for any trade, industry or activity. It does not undertake to prescribe rules of conduct to be applied to particular states of fact determined by appropriate administrative procedure. Instead of prescribing rules of conduct, it authorizes the making of codes to prescribe them. * * * the discretion of the President in approving or prescribing codes, and thus enacting laws for the government of trade and industry throughout the country, is virtually unfettered. We think that the code-making authority thus conferred is an unconstitutional delegation of legislative power." Id., 295 U.S. at pages 541–542, 55 S.Ct. at page 848.

cited approvingly Field and Hampton in the Panama case and Hampton in the Schechter case, and since we believe the decisions in Hampton and Field to be controlling of the issues at bar, we find it unnecessary to discuss those cases further.

■ We now come to the other contention of appellants, that the trade agreement with Iceland executed by the President pursuant to the Trade Agreements Act is null and void because it is, in fact, a treaty and lacks the concurrence of the Senate, required by Article II, § 2 of the Constitution and, further, that since the agreement is illegal the proclamation which effectuated the agreement is also without legal effect.

This procedure was established by Congress so that its policy and the basic philosophy which motivated the passage of the Trade Agreements Act could be realized. From reading the act, it is apparent that Congress concluded that the promotion of foreign trade required that the tariff barriers in this and other countries be modified on a negotiated basis. Since the President has the responsibility of conducting the foreign affairs of this country generally, it gave to him the added responsibility of negotiating the agreements in pursuance of the spirit of the act. Such a procedure is not without precedent nor judicial approval. The Supreme Court in Altman & Co. v. United States, 224 U.S. 583, 601, 32 S.Ct. 593, 597, 56 L.Ed. 894, recognized that not all commercial compacts are treaties, saying:

"\* \* \* While it may be true that this commercial agreement, made under authority of the Tariff Act of 1897, § 3, was not a treaty possessing the dignity of one requiring ratification by the Senate of the United States, it was an international compact, negotiated between the representatives of two sovereign nations, and made in the name and on behalf of the contracting countries, and dealing with important commer-

cial relations between the two countries, and was proclaimed by the President. If not technically a treaty requiring ratification, nevertheless it was a compact authorized by the Congress of the United States, negotiated and proclaimed under the authority of its President."[8]

In United States v. Curtiss-Wright Export Corp., supra, 299 U.S. at page 318, 57 S.Ct. at page 220, the Court observed that "the power to make such international agreements as do not constitute treaties in the constitutional sense, \* \* \* [although not] expressly affirmed by the Constitution, nevertheless exist[s] as inherently inseparable from the conception of nationality."

In United States v. Belmont, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134, which involved the assignment by the Soviet government to the petitioner of certain claims due to that government from American nationals, this question was again discussed. The assignment involved therein was effected by an exchange of diplomatic correspondence between the Soviet government and the United States coincident with the recognition of the Soviet government by the President of the United States. The purpose was to bring about a final settlement of the claims between those governments, it being agreed that the Soviet government would take no steps to enforce claims against American nationals and that all of such claims were released and assigned to the United States. The Supreme Court in upholding the transactions, stated:

"That the negotiations, acceptance of the assignment and agreements and understandings in respect thereof were within the competence of the President may not be doubted. Governmental power over internal affairs is distributed between the national government and the several states. Governmental power over external affairs is not distributed, but is vested exclusively in the na-

8. Footnote ours. The case concerned a related issue of no particular relevance here.

tional government. And in respect of what was done here, the Executive had authority to speak as the sole organ of that government. The assignment and the agreements in connection therewith did not, as in the case of treaties, as that term is used in the treaty making clause of the Constitution (Article 2, § 2), require the advice and consent of the Senate.

"A treaty signifies 'a compact made between two or more independent nations, with a view to the public welfare.' Altman & Co. v. United States, 224 U.S. 583, 600, 32 S.Ct. 593, 596, 56 L.Ed. 894. But an international compact, as this was, is not always a treaty which requires the participation of the Senate. There are many such compacts, of which a protocol, a modus vivendi, a postal convention, and agreements like that now under consideration are illustrations. See 5 Moore, Int. Law Digest, 210–221. The distinction was pointed out by this court in the Altman case, supra, which arose under section 3 of the Tariff Act of 1897, (30 Stat. 151, 203), authorizing the President to conclude commercial agreements with foreign countries in certain specified matters." Id., 301 U.S. at pages 330–331, 57 S.Ct. at page 760.

In United States v. Pink, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796, that Court approved the opinion in the Belmont case, supra, and reaffirmed the proposition that these may be international agreements and compacts which are not treaties within the meaning of the Constitution. We see no significant difference between the executive power exercised and approved in those cases and that in issue here.

This court had occasion to discuss this question in the case of Louis Wolf & Co. v. United States, 107 F.2d 819, 27 CCPA 188, C.A.D. 84. In that case a trade agreement with Cuba consummated under the provisions of the Trade Agreements Act of 1934 was involved. In upholding the agreement this court said:

"We think that an agreement such as the one at bar relating to customs duties which may be levied upon articles of commerce between the two countries (when the agreement is authorized by Congress, although not ratified by the Senate) may be properly styled a commercial convention. We therefore hold that appellants' contentions with reference to the effect of the treaties with Austria and Norway are without merit. See E. & J. Burke, Ltd. v. United States, 26 CCPA, Customs, 374, 379, C.A.D. 44." Id., 107 F.2d at page 827, 27 CCPA at page 200.

We, therefore, hold that the trade agreement with Iceland and the accompanying proclamation are valid. In view of the above analysis of the issues herein and our conclusions with respect thereto, we affirm the judgment of the Customs Court.

Affirmed.